*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* JONES/AUSTIN, Minors.

UNPUBLISHED
June 22, 2026
1:59 PM

Nos. 377671; 377673; 377674;
377675; 377677
Calhoun Circuit Court
Family Division
LC No. 2021-002425-NA

Before: GADOLA, C.J., and RIORDAN and LETICA, JJ.

PER CURIAM.

In these consolidated cases,[1] the trial court terminated respondent-mother's parental rights to DJ, M1, M2, and M3,[2] and respondent-father's parental rights to M1, M2, and M3. On appeal, respondent-mother argues that the Department of Health and Human Services (DHHS) failed to make accommodations for her intellectual disability, that the trial court erred by terminating her rights under MCL 712A.19b(3)(c)(*i*) and (j), and that termination was not in the children's best interests. Respondent-father argues that the trial court abused its discretion by not allowing a rebuttal witness to testify, that termination was not in the children's best interests, and that the trial court erred by terminating his parental rights to M3 at initial disposition. We affirm.

## I. BACKGROUND

In August 2021, 16-month-old DJ went to the hospital after ingesting methamphetamine in respondents' home. At the hospital, DJ, who also had hip dysplasia and developmental delays, tested positive for amphetamines and had scabies. Further, there were concerns of ongoing domestic violence in the home, and respondent-mother had pending charges of first-degree criminal sexual conduct (CSC) related to allegations that she sexually assaulted her younger

---

[1] *In re Jones/Austin*, unpublished order of the Court of Appeals, entered October 21, 2025 (Docket Nos. 377671, 377673, 377674, 377675, and 377675).

[2] The trial court also terminated the parental rights of DJ's father, but he is not a party to this appeal.

cousins when she was a teenager. The trial court removed DJ from respondent-mother and his father.

Respondent-father was arrested in April 2022 after assaulting respondent-mother, which caused her to be hospitalized. Respondent-mother gave birth to M1 and M2 in July 2022, and the trial court removed them from respondents. Respondent-mother was, by that point, on probation after pleading guilty in her CSC case. Respondents also both pleaded guilty to child-abuse charges related to DJ's injuries.

A November 2022 psychological evaluation indicated that respondent-mother had an intellectual disability, after which the DHHS agreed that it needed to provide accommodations to her under *Hicks/Brown*.[3] Respondent-mother was incarcerated in June 2023 and again in August 2023 until April 2024 for violating a no-contact order with respondent-father. The DHHS filed a termination petition in February 2024. After the foster-care agency repeatedly failed to timely file reports, however, the trial court dismissed the termination petition and dismissed the agency from the case in April 2024. Accordingly, a DHHS caseworker assumed responsibility for the case.

Respondents took some parenting classes, and respondent-father became employed at the Women's Co-op. Respondents also obtained housing. Respondents, however, missed most of their drug screens and, for most of the case, failed to participate in counseling services at Summit Point or domestic-violence services at Wings of a Dove as instructed. Respondents did not want to engage at Wings of a Dove because they could not participate together. Instead, respondents began counseling at the Women's Co-op with an unlicensed student therapist. The DHHS expressed concern about the conflict of respondent-father working at the Women's Co-op and ultimately learned that respondent-father was distantly related to certain staff at the Women's Co-op.

The DHHS filed a new termination petition in October 2024, and a termination trial began in December 2024. Respondent-mother gave birth to M3 in May 2025, at which point the trial court removed him from respondents' care, and the DHHS requested that the trial court terminate respondents' parental rights to M3. On September 3, 2025, the trial court terminated respondent-mother's parental rights to DJ, M1, and M2, as well as respondent-father's parental rights to M1 and M2. The trial court took additional testimony regarding M3 on that day and the following day. Respondent-father's attorney attempted to have respondents' counselor from the Women's Co-op, Kimberly Danke, testify in rebuttal. Respondent-father had not included Danke on any witness lists. After arguments by the parties, the trial court ordered that Danke could testify narrowly about her credentials and in rebuttal to testimony given. Before the lawyer-guardian ad litem could cross-examine Danke, however, Danke disconnected from the hearing, and the trial court struck her testimony. The trial court then terminated respondents' parental rights to M3.

Respondents now appeal.

---

[3] *In re Hicks/Brown*, 500 Mich 79; 893 NW2d 637 (2017).

## II. RESPONDENT-FATHER'S APPEAL

### A. REBUTTAL

First, respondent-father argues that the trial court abused its discretion by denying him the right to present a rebuttal lay witness in the proceedings involving M3.

As the prosecution argues on appeal, however, this issue is moot because the trial court struck Danke's testimony after she disconnected from the hearing but before Danke completed cross-examination. This Court will not decide moot issues. *In re Smith*, 355 Mich App 514, 519; 967 NW2d 857 (2021). An issue is moot if an event occurs that renders it impossible for this Court to grant relief. *CD Barnes Assoc, Inc v Star Heaven, LLC*, 300 Mich App 389, 406; 834 NW2d 878 (2013). In other words, because the trial court did initially allow Danke to testify, and because respondent-father does not challenge its subsequent decision to strike her testimony, there is no relief that we may afford with regard to this issue.

Respondent-father argues that Danke would not have become disconnected had the trial court "simply let [Danke] testify as to her impressions based on her rational perception." A trial court must, however, determine preliminary questions about factors like a witness's qualification or the admissibility of evidence. See MRE 104(a). Thus, the trial court did not err by first addressing whether Danke could appropriately testify in rebuttal, and with what scope, particularly when the prosecution and the lawyer-guardian ad litem objected to her testimony. When the trial court struck Danke's testimony, however, the issue of the admissibility of that testimony became moot.

### B. TERMINATION AT INITIAL DISPOSITION

Next, respondent-father argues that the trial court erred by terminating his parental rights to M3 at initial disposition.

We review for clear error a trial court's factual findings and determination that a statutory ground for termination has been satisfied. *In re White*, 303 Mich App 701, 709; 846 NW2d 61 (2014). Clear error exists if this Court is left with a definite and firm conviction that the trial court made a mistake, "giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004).

Generally, when a child is removed from a parent, the DHHS is required to make reasonable efforts to rectify the conditions that led to the removal. *In re Fried*, 266 Mich App 535, 542; 702 NW2d 192 (2005). Reasonable efforts are not required, however, if, among other possible conditions, there was "a judicial determination that the parent has subjected the children to aggravated circumstances as provided in section 18(1) and (2) of the child protection law, 1975 PA 238, MCL 722.638," MCL 712A.19a(2)(a); "[t]he parent has had rights to the child's siblings involuntarily terminated and the parent has failed to rectify the conditions that led to that termination of parental rights," MCL 712A.19a(2)(c); or "[t]he parent is required by court order to register under the sex offenders registration act," MCL 712A.19a(2)(d). See also *In re Moss*, 301 Mich App 76, 90-91; 836 NW2d 182 (2013). MCL 712A.19a(2) "substantively incorporates MCL 722.638, setting the parameters for when the trial court may excuse reasonable efforts aimed at reunification if the aggravated circumstances outlined in MCL 722.638(1) and (2) exist." *In re*

*Barber/Espinoza*, ___ Mich ___, ___ n 5; ___ NW3d ___ (2025) (Docket No. 167745), slip op at 9 n 5. When the DHHS has filed a petition to terminate the parental rights of a child, the trial "court may enter an order terminating parental rights under subsection (3) at the initial dispositional hearing." MCL 712A.19b(4).

In this case, after the preliminary hearing, the trial court properly determined that reasonable efforts were not required for respondent-father because of his previous termination of rights to his other child and his failure to rectify the conditions that led to that termination. See MCL 712A.19a(2)(c). In September 2025, the trial court heard two days of testimony before terminating respondent-father's parental rights to M3. Thus, the trial court did not err by considering the DHHS's request for termination at initial disposition.

To terminate parental rights, the trial court must find clear and convincing evidence of at least one statutory basis for termination under MCL 712A.19b(3). See *In re Sanborn*, 337 Mich App 252, 272; 976 NW2d 44 (2021). A ground for termination exists under MCL 712A.19b(3)(i) if "[p]arental rights to 1 or more siblings of the child have been terminated due to serious and chronic neglect or physical or sexual abuse, and the parent has failed to rectify the conditions that led to the prior termination of parental rights." MCL 712A.19b(3)(i) is an appropriate ground for termination at initial disposition when the circumstances warrant it. See MCR 3.977(E)(3)(b).

By the time the trial court terminated respondent-father's parental rights to M3 on September 4, 2025, the trial court had terminated his parental rights to M1 and M2 on September 3, 2025, and to his other child in 2023. Accordingly, the trial court did not err by finding that respondent-father's parental rights to one or more of M3's siblings already had been terminated. See MCL 712A.19b(3)(i). Respondent-father had shown progress related to housing and employment, and he had not had any positive methamphetamine screens, but he had a history of failing to engage in services, particularly to address domestic violence and substance abuse. Respondent-father tested positive for cocaine in July 2025, and substance abuse was a significant concern considering the serious injury that DJ suffered from methamphetamine ingestion in respondents' home. Further, respondent-father had purportedly stabbed respondent-mother while she was pregnant with M1 and M2, although respondents denied this at trial; regardless, respondent-father failed to even begin addressing the domestic-violence concerns until July 2025. Respondent-father continued to demonstrate emotional dysregulation during hearings. The trial court noted that respondent-father had not, apparently, addressed his anger issues. Accordingly, the trial court did not clearly err by finding that respondent-father's parental rights had been terminated to M3's siblings under circumstances that may be characterized as "serious and chronic neglect or physical or sexual abuse," and that he had failed to rectify the conditions that led to those terminations. See MCL 712A.19b(3)(i).

Moreover, a ground for termination exists under MCL 712A.19b(3)(j) if "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." "[A] parent's failure to comply with the terms and conditions of his or her service is evidence that the child will be harmed if returned to the parent's home." *In re White*, 303 Mich App at 711.

The trial court did not clearly err by finding that termination was warranted under this ground, for many of the same reasons as earlier noted. Respondent-father had a significant history

-4-

of substance abuse and domestic violence. Although respondent-father had obtained employment and housing, there is no indication that he had addressed his anger issues. The trial court found that aggravated circumstances existed, so the DHHS did not offer services in M3's case, but respondent-father demonstrated inconsistent compliance throughout the years of offered services. DJ suffered serious injuries when he ingested methamphetamine while in respondents' care, and respondent-father tested positive for cocaine in July 2025. By the time of the termination proceedings related to M1 and M2, respondent-father had not engaged in mental-health services and had stopped taking his prescribed medication. Moreover, he repeatedly walked out of hearings when he was upset. Accordingly, the trial court did not clearly err by finding that there was a reasonable risk of harm to M3 if he was returned to respondent-father's care. See MCL 712A.19b(3)(j).

## C. BEST INTERESTS

Finally, respondent-father argues that the trial court erred by finding that termination was in the children's best interests.

"Even if the trial court finds that the Department has established a ground for termination by clear and convincing evidence, it cannot terminate the parent's parental rights unless it also finds by a preponderance of the evidence that termination is in the best interests of the children." *In re Gonzales/Martinez*, 310 Mich App 426, 434; 871 NW2d 868 (2015). We review for clear error a trial court's best-interest determination. *In re Sanborn*, 337 Mich App at 276.

When determining whether termination is in a child's best interests, the trial court may consider evidence that includes "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Atchley*, 341 Mich App 332, 346; 990 NW2d 685 (2022) (quotation marks and citation omitted). Further, the trial court may consider "the length of time the child was in care, the likelihood that the child could be returned to her parents' home within the foreseeable future, if at all, and compliance with the case service plan." *Id*. at 346-347 (quotation marks and citation omitted). The focus of the best-interest determination is on the child, rather than the parent. *Id*. at 346.

In this case, the trial court properly considered the children's best interests. M1 and M2 were together in a preadoptive placement, along with DJ and M3, and they were doing well in the home. Respondent-father argues on appeal that the trial court failed to specifically address M1's and M2's best interests as they related to respondent-father. In its best-interest determination, however, the trial court specifically noted concerns with respondent-father's behavior and emotional stability. The trial court's best-interest explanation was brief, but, during the statutory-grounds determination, the trial court considered factors such as respondent-father's criminality, violence, substance abuse, and his refusal to engage in services.

By the time of the termination decision, respondents had only just begun services at Wings of a Dove and had refused participation at Summit Point and Grace Health for most of the case. Moreover, M1 and M2 had never lived with respondents. Although respondents had obtained housing, respondent-father was employed, and respondents had been consistent with parenting time and, over the previous few months, with drug screens, respondents were, overall, not

compliant with the majority of their services throughout the case. See *id*. at 346-347. There remained significant domestic-violence concerns, including that respondent-father purportedly stabbed respondent-mother while she was pregnant with M1 and M2, although respondents denied that at trial, as well as respondent-father's 2024 conviction of domestic violence against another woman. Further, respondent-father tested positive for cocaine in July 2025. Although he disputed that result, these cases began because DJ ingested methamphetamine while in the care of respondents. Accordingly, substances remained a concern nearly four years later. The trial court did not fail to consider respondent-father when determining the twins' best interests and did not clearly err by finding that termination was in M1's and M2's best interests. See *In re Gonzales/Martinez*, 310 Mich App at 434.

Next, the trial court did not clearly err by finding that terminating respondent-father's parental rights was in M3's best interests as well. Although respondent-father argues on appeal that the trial court should have allowed more time before making the determination, the trial court had nearly four years of respondent-father's history to consider. Not only had the trial court just terminated respondent-fathers' parental rights to M1 and M2 the day before, the trial court previously terminated his parental rights to his other child in 2023. In this case, the trial court considered that M3 was in a preadoptive placement with DJ, M1, and M2, and the trial court found that respondent-father could not, considering his history, rectify his issues in a reasonable time. The trial court also acknowledged that respondent-father loved M3 and his siblings. Considering, however, the serious domestic violence and substance concerns in the home for several years, the length of time that M3's siblings had been out of the home, and respondent-father's ongoing inconsistency with services when M3 required permanency, the trial court did not clearly err by finding that termination of respondent-father's rights was in M3's best interests.

### III. RESPONDENT-MOTHER'S APPEAL

### A. ACCOMMODATIONS

First, respondent-mother argues that the DHHS failed to make accommodations when offering services.

We review for clear error whether the DHHS made reasonable efforts to preserve and reunify the family. See *In re MJC*, 349 Mich App 42, 47; 27 NW3d 122 (2023). Further, we review de novo as a question of constitutional law whether a child-protective proceeding afforded a parent due process. *In re Rood*, 483 Mich 73, 91; 763 NW2d 587 (2009).

Under the Americans with Disabilities Act, 42 USC 12101 *et seq*., the DHHS must make reasonable accommodations for respondents with disabilities. See *In re Hicks/Brown*, 500 Mich 79, 86; 893 NW2d 637 (2017). If the DHHS failed to make such accommodations, then efforts at reunification are not reasonable. *Id*. Termination is improper without a trial court finding of reasonable efforts. *Id*. at 90.

In this case, the trial court did not clearly err by determining that the DHHS made reasonable efforts and accommodations toward respondent-mother's reunification with DJ, M1, and M2. Although respondent-mother argues that she testified "without contradiction" that the DHHS rarely used the Teach-Back method, DHHS caseworker Erin Geier testified that she had

respondent-mother explain the service plans back to Geier in respondent-mother's own words and carefully reviewed the parent-agency treatment plans with her. Further, Geier twice created specific checklists for respondent-mother, explaining the required services. Although Geier also made the checklists for respondent-father, Geier's extra efforts for respondent-father do not detract from the efforts for respondent-mother, particularly when respondents operated as one household, and respondent-father's engagement in services affected respondent-mother's reunification efforts.

The only service that respondent-mother identified at trial that would have been helpful to her were services to help her with DJ's special needs. The DHHS had, however, twice referred respondent-mother to supportive visitation, but respondent-mother did not participate. Respondent-mother completed some counseling and other services before she was incarcerated, as well as at least some parenting education. Had respondent-mother completed her second psychological evaluation, however, or consistent counseling once Geier became involved in the case, respondent-mother may have obtained those added supports. Although respondent-mother argues that she did not understand until April 2025 that the service "recommendations" were court orders because nobody explained that to her, the trial court specifically rejected that claim. When Geier repeatedly reviewed the services with respondent-mother, respondent-mother was present for hearings at which the parties discussed the services, and the trial court ordered that respondent-mother comply with the service plans, the trial court's findings were not clearly erroneous.

Respondent-mother also argues that she was not granted parenting time during her incarceration. Although there was some testimony that respondent-mother used her free video calls to speak with others, rather than her children, caseworkers from Samaritas testified about facilitating weekly video visits while respondent-mother was in jail. Limiting respondent-mother to parenting time only if she had a free call available would be unreasonable, particularly under the circumstances of respondent-mother's cognitive disabilities and domestic violence. Regardless, the trial court removed Samaritas from the case because of its failures to communicate and file required documents. At that point, the trial court also dismissed the pending termination petition, which gave respondent-mother a continued opportunity to work toward reunification. Geier and the DHHS indisputably made parenting time available to respondent-mother. Therefore, the trial court did not err by finding that the DHHS made reasonable efforts and accommodations for respondent-mother.

## B. STATUTORY GROUNDS

Next, respondent-mother argues that the trial court erred by finding that statutory grounds for termination existed under MCL 712A.19b(3)(c)(*i*) and (j).

MCL 712A.19b(3)(c)(*i*) and (j) were the grounds under which the trial court terminated respondent-mother's parental rights to M1, M2, and DJ. The trial court, however, terminated respondent-mother's parental rights of M3 under MCL 712A.19b(3)(i), (j), and (k). A trial court need only find one statutory ground to terminate a parent's rights, even if the trial court errs by finding sufficient evidence under another statutory ground. See *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011). Because respondent-mother fails to address two statutory grounds that resulted in termination of her rights to M3, respondent-mother abandoned her statutory-ground

challenge of M3, and this Court need not review it. See *In re Rippy*, 330 Mich App 350, 362 n 5; 948 NW2d 131 (2019).

Next, as to the other three children under MCL 712A.19b(3)(c)(*i*), the trial court issued its disposition order as to respondent-mother and DJ on November 8, 2021, which was significantly more than 182 days before the trial court issued its termination order on September 3, 2025. See MCL 712A.19b(3)(c)(*i*).[4] The trial court issued its dispositional order as to respondent-mother and the twins on August 31, 2022, which also was significantly more than 182 days before the trial court terminated respondent-mother's parental rights to M1 and M2 on September 3, 2025.

Further, the trial court did not clearly err by finding that the conditions that led to the adjudication continued to exist. See *id*. With DJ, respondent-mother pleaded to issues including substance abuse in the home, pending CSC charges, the need for services, and her inability to provide a safe home or proper care and custody of DJ. In regard to M1 and M2, respondent-mother pleaded to issues involving housing; an inability to provide proper care and custody; the need for services to address mental-health, substance-abuse, and domestic-violence issues; and her CSC probation. By the time that the trial court terminated respondent-mother's parental rights to DJ, M1, and M2, respondent-mother had engaged in minimal services and failed to demonstrate significant benefit, although respondent-mother had obtained housing and had income. Respondent-mother previously had housing, however, and lost it for twice violating a no-contact order with respondent-father. Although respondent-mother reportedly could not maintain her current home without the assistance of respondent-father, there were significant concerns about domestic violence between the two, which respondent-mother failed to address throughout the case.

Moreover, the case began when DJ ingested methamphetamine in respondents' home. Respondent-mother was inconsistent with drug screens throughout the case until the last few months of the termination proceedings. Generally, the only positive screens were for tetrahydrocannabinol (THC), to which, other than while respondent-mother was pregnant, the DHHS did not object. Geier confirmed, however, that she informed respondents that missed screens were considered to be positive screens. Further, respondent-father tested positive for cocaine in July 2025, well into the termination proceedings. Respondents were acting as a single household, so respondent-father's use of an illegal substance meant that respondent-mother was not in a substance-free home. Considering the limited participation in services and progress, the trial court did not clearly err by finding that respondent-mother would not rectify the conditions that led to adjudication in a reasonable time. See *id*.

Further, while we need not address the issue, for many of the same reasons as with MCL 712A.19b(3)(c)(*i*), the trial court did not clearly err by finding that termination of respondent-mother's parental rights was warranted under MCL 712A.19b(3)(j). Domestic

---

[4] MCL 712A.19b(3)(c)(*i*) provides that termination is appropriate when "[t]he parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds . . . [t]he conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age."

violence was a significant concern for respondents. Respondent-mother admitted to being the victim and a perpetrator of violence. Significantly, respondent-mother's grandmother testified that respondent-father stabbed respondent-mother while she was pregnant with the twins. Respondent-mother denied at trial that respondent-father stabbed her in that incident, but she admitted that he was violent with her and that she did not fight back on that occasion. Moreover, respondent-father had been convicted of domestic violence against another woman in January 2024.

It would not be proper for this Court to hold against a person that he or she was the victim of domestic violence. See *In re Plump*, 294 Mich App 270, 273; 817 NW2d 119 (2011). However, a parent's own actions that harm his or her children, or expose them to harm, or an inability to protect his or her child, are important considerations. See *id*. Respondent-mother had only started to address domestic violence at Wings of a Dove in July 2025, nearly four years into the beginning of her involvement with the DHHS, and respondent-mother also did not think that that service was sufficient because Wings of a Dove solely treated her as a victim while she had also been violent with respondent-father. Whether respondent-mother acted violently to defend herself or for some other reason, respondent-mother had chosen not to engage with Wings of a Dove in 2024 because she could not participate with respondent-father. Respondent-father also was the payee for respondent-mother's SSI benefits, which raised concerns about his influence over her. Members of respondent-mother's family had stopped supporting her because of her relationship with respondent-father, and Geier had been concerned that respondent-father drove a wedge between respondent-mother and the previously supportive foster parent, in addition to respondent-father speaking for respondent-mother during meetings.

Respondent-mother also testified that DJ's father raped her, resulting in her pregnancy with DJ. Despite the sexual assault, respondent-mother allowed DJ's father to have parenting time with DJ, purportedly at the behest of respondent-mother's family. Moreover, respondent-mother's mother lived with DJ's father, and respondent-mother testified that her mother used methamphetamine. And, in respondent-mother's own home, regardless of whether it was respondent-father or both respondents using methamphetamine, DJ ingested methamphetamine. Further, despite making progress earlier in the case, respondent-mother at least twice violated her no-contact order with respondent-father and ended up incarcerated for a significant period. Her incarceration, although not a sole reason to terminate parental rights, see *In re Mason*, 486 Mich 142, 160; 782 NW2d 747 (2010), caused her to lose her housing and impeded her efforts overall. Therefore, the trial court did not clearly err by terminating respondent-mother's parental rights under MCL 712A.19b(3)(j).

## C. BEST INTERESTS

Finally, respondent-mother argues that the trial court erred by finding that termination was in the children's best interests.

The record demonstrated that respondent-mother's parenting time generally went well. Although respondent-mother argues that the DHHS downplayed her bond with the children, Geier testified that her observations were that DJ, M1, and M2 were happy to see respondents, but they were more excited to see their foster parents than they were to see respondents. Geier also testified that M3 acted similarly whether with his foster parents or respondents. Geier, accordingly, did not deny that the children, especially the older three, had positive relationships with respondent-

mother. Specifically during termination proceedings for M3, the trial court also noted that respondents loved the children. Accordingly, the trial court did not clearly err when considering the bonds that the children shared with respondent-mother. See *In re Atchley*, 341 Mich App at 346.

The trial court also did not clearly err by finding that the children needed permanency. See *id*. DJ, M1, and M2 had been in foster care for years. Only in July 2025, months into the termination proceedings, did respondents begin to engage in domestic-violence services. That same month, respondent-father tested positive for cocaine, and respondents were operating as a single household. Accordingly, substance abuse remained a concern in the household. Respondent-mother had a responsibility to participate in, and benefit from, services, and the record demonstrated limited compliance or benefit. See *In re Frey*, 297 Mich App 242, 247-248; 824 NW2d 569 (2012). It was unlikely that the children would be able to return to respondents' care.

The trial court also found that the children were placed in a preadoptive home together. Although respondent-mother argues on appeal that the trial court failed to consider less-drastic measures, Geier did not think that the foster parents were interested in a guardianship. Respondent-mother also argues that Geier testified that reunification could occur in three to six months, or sooner if respondent-mother parented alone, but Geier testified that reunification in that period only was possible if respondents demonstrated sobriety and compliance with services. The record demonstrated that respondent-mother had come close to reunification earlier in the case but was then incarcerated for twice violating a no-contact order with respondent-father. Accordingly, although respondent-mother had been more compliant with services in the last couple months before termination, respondent-mother did not demonstrate that she could maintain that compliance or benefit in the long term. Moreover, respondent-mother intended to remain with respondent-father, so her chances of reunification also relied on respondent-father's compliance, and he had just tested positive for cocaine and stopped his medication without medical guidance.

Finally, although respondent-mother argues on appeal that the trial court could not assume that adoption was superior to reunification or would provide greater stability, the trial court made its best-interest determination on the basis of its understanding of the years-long cases. Therefore, the trial court did not clearly err by finding that termination of respondent-mother's parental rights was in the children's best interests.

## IV. CONCLUSION

There were no errors warranting relief in any of the consolidated cases before us. Accordingly, we affirm.

/s/ Michael F. Gadola
/s/ Michael J. Riordan
/s/ Anica Letica